Filed 3/24/23  In re D.R. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B317364 (Super. Ct. No. PJ52824) (Los Angeles County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>D.R.,<br><br>    Defendant and Appellant. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered the opinion filed herein on March 14, 2023, be modified as follows:

1. On page 7, the text of footnote 2 is deleted and replaced with:

[2] Detective Aguilar's testimony that MS-13 members routinely engage in robberies and murders provides substantial evidence of the gang's primary activities (see *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324), which permits readjudication of the gang enhancement (*People v. Sek* (2022) 74 Cal.App.5th 657, 669).

2. On page 10, lines 4-6 of footnote 3, the phrase "or that the evidence failed to show that MS-13 is a criminal street gang" is deleted so that footnote 3 reads:

[3] Because Assem. Bill No. 333 requires us to vacate both the gang enhancement and the juvenile court's true finding on the gang-murder special circumstance, we do not resolve D.R.'s assertions that Detective Aguilar provided hearsay testimony.

There is no change in the judgment.
Appellant's petition for rehearing is denied.

GILBERT, P. J.                    BALTODANO, J.

2

Filed 3/14/23 In re D.R. CA2/6 (Unmodified opinion)
See dissenting opinion
# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B317364 (Super. Ct. No. PJ52824) (Los Angeles County) |
| THE PEOPLE, Plaintiff and Respondent, v. D.R., Defendant and Appellant. | |

D.R. appeals from the jurisdictional and dispositional orders imposed after the juvenile court sustained an allegation that he committed first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a)). The court also found true an allegation that D.R. committed his offense for the benefit of a criminal street

---

[1] Unlabeled statutory references are to the Penal Code.

gang (§ 186.22, subd. (b)(1)(C)), and special circumstance allegations that he committed murder while lying in wait (§ 190.2, subd. (a)(15)) and while an active participant in a gang (§ 190.2, subd. (a)(22)). It declared him a ward of the court and ordered him committed to the custody and care of the Division of Juvenile Justice (DJJ) for a "youth life" term.

D.R. contends: (1) the juvenile court's finding that he committed murder for the benefit of a criminal street gang must be vacated, (2) the gang-murder special circumstance finding must be vacated, (3) the gang expert relied on hearsay to establish predicate offenses, (4) there was insufficient evidence of his alleged gang's primary activities, and (5) the court erred when it ordered a DJJ commitment. We vacate the gang enhancement and the gang-murder special circumstance finding, and remand.

FACTUAL AND PROCEDURAL HISTORY

*The murder of B.A.*

D.R. was in high school in the fall of 2017. He and several friends were either members or associates of the MS-13 street gang. B.A., another high schooler, was a member of the rival 18th Street gang. He wore a backpack to school that said "Fuck MS." He was also vocal about his dislike of MS-13.

In October, two MS-13 gang members took B.A. to a park after school. Other MS-13 members were already there. The group took B.A. to a canyon overlook with a 30- to 40-foot drop off and then walked down a trail where D.R. and other gang members were waiting. One of them hit B.A. in the face. D.R. grabbed him from behind. B.A. was not seen alive again.

B.A.'s remains were found at the bottom of the overlook six weeks later. His jawbone and teeth had been pushed up into his

2

skull. The injuries to his face and head were consistent with being struck by a large knife or machete.

*The jurisdiction hearing*

Prosecutors charged D.R. with the murder of B.A. Detective Steven Aguilar testified as an expert on the MS-13 street gang at the jurisdiction hearing. Detective Aguilar said that there are four stages to becoming an MS-13 member: (1) "paro," where a prospective member does minor tasks for the gang and acts as a lookout, (2) "observacion," where the person is observed as they take a more active role in gang activities, (3) "chiqueo," where the person commits crimes like taggings or robberies, and (4) a full-fledged "homeboy." Prospective MS-13 members must commit a murder, usually in a group setting, to become a homeboy. They participate in group murders to prevent snitching, since all participants will be culpable. If someone does snitch, other MS-13 members will kill them and, potentially, their friends and family.

Detective Aguilar opined that D.R. and his associates murdered B.A. for the benefit of MS-13. Three of D.R.'s associates admitted they were MS-13 members. They used a machete during the murder, one of the gang's signature traits. And the murder could be used as a recruitment tool since it was done at the direction of older gang members in a manner that could benefit MS-13's reputation.

Detective Aguilar also testified about two other crimes committed by MS-13 gang members that enhanced the gang's reputation. One self-proclaimed MS-13 member pleaded no contest to making criminal threats. As part of this plea, he admitted that he had suffered a prior conviction for extortion with a gang enhancement. A jury convicted another MS-13

3

member of attempted murder, and found true an attached gang allegation.

*The disposition hearing*

The juvenile court concluded that D.R. was responsible for B.A.'s murder. He remained in juvenile hall while awaiting the November 2021 disposition hearing, and obtained his high school diploma during that time. He asked to be placed in a community detention program (CDP) or released to his mother on house arrest so he could continue his education at a local college. Alternatively, he asked to be placed in a local secure youth treatment facility (SYTF).

The SYTF was scheduled to open in March 2022. Security enhancements were still in development. Other than the probation department's developmental stage system, no SYTF external programs would be evidence based.

The SYTF was slated to offer group and individual therapy to address anger management, cognitive behavioral skills, and decision making. Minors placed there would receive "some individual case management," would be eligible for an art-based curriculum, and could participate in mentoring, gangs anonymous, and family therapy. Anticipated future programming included a creative writing program, dialectical behavior therapy, and healing dialogue through restorative justice groups. Whether a minor could take advantage of the restorative justice program depended on whether victims or family members were willing to participate.

The probation department recommended committing D.R. to DJJ. D.R. had "a history of gang-related assaultive behavior," including an arrest for a gang-related battery on school property. His role in B.A.'s murder demonstrated "a high level of criminal

4

sophistication" and "a high degree of planning and coordination." It also showed he was "deeply entrenched in the gang lifestyle." A less-restrictive alternative to DJJ would "lack the programming length to provide public safety and services needed to achieve the rehabilitative goals that [would] support [D.R.'s] eventual integration back to the community."

If committed to DJJ, D.R. would be assessed by a psychologist and meet with an education advisor and casework specialist to complete a social and risk needs assessment. His overall risk score would help determine his core programming. DJJ counselors would then help to provide various intervention programs for D.R. All programs would be evidence based and "highly individualized."

The probation department considered an SYTF placement but rejected it due to the severity of D.R.'s offense and because DJJ's integrated behavior treatment model was more appropriate. Additionally, records from juvenile hall showed that D.R. had been disruptive and defiant there, refused to follow instructions, used inappropriate language, and continued gang-related activity. And prior to murdering B.A., D.R. participated in therapeutic services related to gang prevention, including one year of therapy, but "there [was] no indication that [he] would be responsive to services in the future" given his participation in B.A.'s murder.

The juvenile court agreed that a DJJ commitment was appropriate. DJJ's programming, treatment, and education could meet D.R.'s treatment and security needs. Its evaluation and individualized treatment programs were unmatched. Its evidence-based programs were the "gold standard."

5

Less-restrictive alternatives were inappropriate. While D.R. had no prior sustained petitions, had successfully completed a period of voluntary supervision, and had participated in gang prevention services—all of which weighed in favor of a local treatment—CDP was inappropriate given D.R.'s "strong ties . . . to the gang that got him" involved in B.A.'s murder. Returning D.R. to his mother would similarly be contrary to his welfare. If assigned to the SYTF, D.R. could end up in juvenile hall for a long time waiting for it to open. Such a wait was inappropriate when the programs slated to be offered at the SYTF were provided elsewhere.

## DISCUSSION

### *The gang enhancement*

D.R. contends, and the Attorney General concedes, the juvenile court's finding that he committed murder for the benefit of a criminal street gang must be vacated due to the enactment of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assem. Bill No. 333). We agree.

Effective January 1, 2022, Assem. Bill No. 333 amended section 186.22 in several ways. Relevant here, the bill modified the "pattern of criminal gang activity" element of the gang enhancement to require that the predicate offenses commonly benefitting a criminal street gang must do more than affect the gang's reputation. (Stats. 2021, ch. 699, § 3; see § 186.22, subd. (e).) The bill also clarified that to "benefit, promote, further, or assist" a gang "means to provide a common benefit to members of a gang where the common benefit is more than reputational." (Stats. 2021, ch. 699, § 3; see § 186.22, subd. (g).)

Assem. Bill No. 333's amendments to section 186.22 apply retroactively to cases that are not yet final on appeal. (*People v.*

6

*Lopez* (2021) 73 Cal.App.5th 327, 344-345 (*Lopez*).) And as the Attorney General concedes, here there was no evidence that the two predicate offenses Detective Aguilar testified about benefited MS-13 in any way that was more than reputational. The gang enhancement must thus be vacated and the matter remanded for prosecutors to readjudicate the enhancement, if they so choose, to meet the new burden of proof imposed by Assem. Bill No. 333.[2] (*Lopez*, at p. 348.)

*The gang-murder special circumstance*

D.R. next contends Assem. Bill No. 333 requires vacating the juvenile court's finding that he committed murder while an active participant in a criminal street gang. We agree once again.

The gang-murder special circumstance applies if a minor "intentionally killed the victim while [they were] an active participant in a criminal street gang, *as defined in subdivision (f) of [s]ection 186.22*, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22), italics added.) Subdivision (f) of section 186.22 defines a "criminal street gang" as a group that engages in a "pattern of criminal gang activity." Subdivision (e) of section 186.22 defines "pattern of criminal gang activity" as committing offenses that benefit a gang in a way that is "more than reputational." Here, all parties agree there was no evidence presented that the murder of B.A. benefited MS-13 in any way that was more than reputational. The gang-murder special circumstance thus does not apply.

---

[2] Given our conclusion, we do not consider D.R.'s alternative arguments as to why the enhancement must be vacated.

The Attorney General disagrees, countering that applying Assem. Bill No. 333's amended definitions to the gang-murder special circumstance would be unconstitutional. Our sister courts are divided on this issue. (Compare *People v. Rojas* (2022) 80 Cal.App.5th 542 (*Rojas*), review granted Oct. 19, 2022, S275835, with *People v. Lee* (2022) 81 Cal.App.5th 232 (*Lee*), review granted Oct. 19, 2022, S275449.)

In *Rojas*, our colleagues in the Fifth District held that Assem. Bill No. 333 is unconstitutional to the extent it narrows the scope of conduct made punishable under section 190.2, subdivision (a)(22). (*Rojas*, *supra*, 80 Cal.App.5th at p. 555, review granted.) Section 190.2 sets forth a list of special circumstances under which the punishment for first degree murder is death or life in state prison without the possibility of parole. (§ 190.2, subd. (a).) Proposition 21, enacted by voters in 2000, added the gang-murder special circumstance to this list. (§ 190.2, subd. (a)(22); see Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 11, pp. 121-122.) That special circumstance borrows the definition of "criminal street gang" from section 186.22. (See § 190.2, subd. (a)(22).) Assem. Bill No. 333 narrowed that definition. (*Rojas*, at pp. 552-553.) To the *Rojas* court, such a narrowing was unconstitutional because the Legislature did not enact Assem. Bill No. 333 with the two-thirds vote required to amend Proposition 21. (*Rojas*, at pp. 553, 557-558.)

In *Lee*, our colleagues in Division 4 of this district reached the opposite conclusion, finding no indication that voters intended to prohibit future amendments to section 186.22 from being incorporated into the gang-murder special circumstance. (*Lee*, *supra*, 81 Cal.App.5th at pp. 241-242, review granted.)

8

When enacting Proposition 21, voters "clearly knew how to express the intent to freeze a statutory definition" because they did so by changing the " ' "lock-in" ' " date for determining the existence of qualifying offenses under the "Three Strikes" law. (*Lee*, at p. 243.) "[H]ad the voters also intended . . . Proposition 21 to make a time-specific incorporation of section 186.22, subdivision (f), they would 'have said so in readily understood terms.' " (*Ibid*.; cf. *People v. Lopez* (2022) 82 Cal.App.5th 1, 24-25 [applying same analysis and concluding that Assem. Bill No. 333 applies to criminal gang conspiracy statute].) "But there is no such language." (*Lee*, at p. 243.) "There is [thus] simply no basis to believe that the voters understood they were precluding future amendments of subdivision (f) of section 186.22 as referred to in the gang-murder special circumstance, while permitting such future amendments for section 186.22 itself." (*Ibid*.)

Moreover, applying Assem. Bill No. 333 to the gang-murder special circumstance is "fully consistent with the purpose of Proposition 21." (*Lee*, *supra*, 81 Cal.App.5th at p. 243, review granted.) Proposition 21 "was aimed in pertinent part at increasing the sentences for 'gang-related' felonies and murder." (*Lee*, at p. 244.) But it was not aimed at defining what constituted a "gang-related" offense. (*Ibid*.) Applying Assem. Bill No. 333 to the gang-murder special circumstance thus "does not change the punishment for 'murderers who kill as part of any gang-related activity' "; "[i]t simply refines the concept of what constitutes a 'gang-related' murder." (*Lee*, at p. 244; see also *People v. Boukes* (2022) 83 Cal.App.5th 937, 943, fn. 5 [Assem. Bill No. 333 applies to the gang-murder special circumstance], review granted Dec. 14, 2022, S277103; *Lopez*, *supra*, 73 Cal.App.5th at pp. 346-347 [same].)

We find *Lee* persuasive, and conclude that Assem. Bill No. 333 did not unconstitutionally amend Proposition 21. A contrary conclusion would result in considerable confusion: Where, as here, prosecutors allege both a gang enhancement and a gang-murder special circumstance, the definitions of "pattern of criminal gang activity" and "criminal street gang" as amended by Assem. Bill No. 333 would apply to the enhancement but not the special circumstance. Such incongruous definitions could, in turn, lead to absurd consequences: A defendant "could be found not to qualify for the lesser gang . . . enhancement[] but nonetheless found to qualify for capital punishment." (*Lee, supra,* 81 Cal.App.5th at p. 242, fn. 36, review granted.) The electorate surely did not intend to adopt such an absurd result. The juvenile court's true finding on the gang-murder special circumstance must thus be vacated.[3] As with the gang enhancement, on remand prosecutors may readjudicate the special circumstance allegation if they so choose. (*Id.* at p. 246.)

*The DJJ commitment*

Finally, D.R. contends the juvenile court erred when it ordered him committed to the custody and care of DJJ. We disagree.

When determining an appropriate disposition, a juvenile court must consider "(1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor,

---

[3] Because Assem. Bill No. 333 requires us to vacate both the gang enhancement and the juvenile court's true finding on the gang-murder special circumstance, we do not resolve D.R.'s assertions that Detective Aguilar provided hearsay testimony or that the evidence failed to show that MS-13 is a criminal street gang.

10

and (3) the minor's previous delinquent history." (Welf. & Inst. Code, § 725.5.) If DJJ is among the potential dispositions, the court must also consider local alternatives to a DJJ commitment. (Welf. & Inst. Code, § 736.5, subd. (c).) A DJJ commitment additionally requires evidence of a probable benefit to the minor and evidence that less-restrictive alternatives would be ineffective or inappropriate. (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 485.) We review for abuse of discretion. (*Ibid*.)

There was no abuse of discretion here. The juvenile court read and considered D.R.'s "very large file"—including probation reports, observational reports, and letters of recommendation—and heard testimony about various placement options before concluding that a DJJ commitment would be most appropriate. The evidence showed that D.R. was 16 years old when he murdered B.A., and 20 by the time of the disposition hearing. That murder was a serious felony, one that demonstrated "a high level of criminal sophistication" and "a high degree of planning and coordination." It was also the latest offense in D.R.'s escalating history of gang-related assaultive behavior. A structured, secure placement was therefore necessary to help rehabilitate D.R. and ensure the safety of the community.

Local alternatives to a DJJ commitment would not meet these goals. Placement in a CDP was inappropriate given D.R.'s strong gang ties. Returning D.R. to his mother would be contrary to his welfare. Assignment to the local SYTF would entail an inappropriately long wait for programming, not all of which was the evidence-based type most appropriate for D.R. It was also not clear how the SYTF's restorative justice model would work with a minor, like D.R., who had received a year of therapy before murdering B.A. And the security measures there were still in

11

development, which was a concern given D.R.'s history of disciplinary problems in juvenile hall and his failure to respond to local treatments. (See, e.g., *In re Greg F.* (2012) 55 Cal.4th 393, 418 [DJJ commitment may be appropriate where minor previously failed local treatment].)

A DJJ commitment, in contrast, would likely benefit D.R. DJJ's integrated behavior treatment model is the "gold standard." It includes evidence-based, "highly individualized" programs and education to meet D.R.'s treatment and security needs. DJJ also has the structure and security measures in place to help ensure D.R.'s success.

This case is unlike *In re Calvin S.* (2016) 5 Cal.App.5th 522, on which D.R. relies. In *Calvin S.*, our colleagues in Division 7 vacated a DJJ commitment order due to a lack of evidence showing that a juvenile hall commitment would be ineffective or inappropriate. (*Id.* at pp. 528-529.) To the contrary, the evidence in the record showed that the minor would continue to receive the "educational, counseling, and other rehabilitative services everyone agreed he needed" in juvenile hall. (*Id.* at p. 529.)

The facts here are different. When deciding the most appropriate placement for D.R., the juvenile court considered various reports and documents and testimony from several witnesses. That evidence showed that less-restrictive alternatives would be ineffective or inappropriate due to safety concerns, D.R.'s prior behavioral challenges, and his particularized educational and rehabilitative needs. The evidence also showed that juvenile hall or the local SYTF could not provide the programming D.R. needed—at least not for some time. The juvenile court thus did not abuse its discretion when it ordered a DJJ commitment.

## DISPOSITION

The true findings on the gang enhancement and gang-murder special circumstance are vacated, and the matter is remanded to the juvenile court to provide prosecutors the opportunity to readjudicate those allegations. After the court determines the status of the allegations, the clerk of the court shall prepare amended jurisdictional and dispositional orders and forward copies to the DJJ. In all other respects, the orders are affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.


I concur:


GILBERT, P. J.

13

YEGAN, J., Dissenting:

I respectfully dissent from vacating the special circumstance finding. The issue of the constitutionality of Assembly Bill No. 333 (2021-2022 Reg. Sess.), purporting to modify an initiative passed by the voters, pends in our Supreme Court. In my view, the opinion in *People v. Rojas* (2022) 80 Cal.App.5th 542, 555, review granted Oct. 19, 2022, S275835, is here controlling and *People v. Lee* (2022) 81 Cal.App.5th 232, review granted Oct. 19, 2022, S275449, should not here dictate reversal. This is one the most brutal murders ever committed and considered by this court. By any standard of review, this was a gang murder. How could it be otherwise? In all other respects, I concur in the majority opinion.

NOT TO BE PUBLISHED.

YEGAN, J.

Fred J. Fujioka, Judge

Superior Court County of Los Angeles

_____

Mary Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.